ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| | | |
|---|---|---|
| MARIBEL PEDRAZA ABREU<br><br>Apelante<br><br>v.<br><br>AMGEN MANUFACTURED LIMITED; KELLY SERVICES, INC.<br><br>Apelados | KLAN202300768 | *Apelación* procedente del Tribunal de Primera Instancia, Sala Superior de Caguas<br><br>Sobre: Despido Injustificado (Ley Núm. 80)<br><br>Caso Núm.: CG2021CV01005 (701) |

Panel integrado por su presidente, el Juez Rodríguez Casillas, la Jueza Mateu Meléndez y el Juez Marrero Guerrero.

Rodríguez Casillas, juez ponente.

# SENTENCIA

En San Juan, Puerto Rico, a 28 de mayo de 2025.

Comparece ante nos la Sra. Maribel Pedraza Abreu (en adelante, "señora Pedraza Abreu" o "parte apelante") para que revoquemos la *Sentencia* emitida el **18 de agosto de 2023**,[1] por el Tribunal de Primera Instancia, Sala Superior de Caguas (en adelante, "TPI"). Allí, se acogieron las solicitudes de sentencia sumaria presentadas por Kelly Services, Inc. (en adelante, "Kelly Services") y Amgen Manufactured Limited (en adelante, "Amgen") (en conjunto, "parte apelada"), y se desestimó la querella por despido injustificado y discrimen laboral presentada por la señora Pedraza Abreu.

Por los fundamentos que esbozamos a continuación, **confirmamos** la *Sentencia* emitida por el TPI.

---

[1] Notificada el 22 de agosto de 2023.

**-I-**

El **28 de abril de 2021**, la señora Pedraza Abreu presentó una *Querella* contra Kelly Services y Amgen, por despido injustificado y discrimen por razón de edad al amparo del procedimiento sumario para reclamaciones laborales.[2] En síntesis, alegó que suscribió un contrato de empleo temporero con Kelly Services para trabajar con cualquier corporación que fuera cliente de Kelly. Por lo cual, en virtud del referido contrato, laboró como operaria de la línea de producción de Amgen, durante períodos de tres (3) meses renovados consecutivamente, desde el 26 de febrero de 2018 hasta el 30 de abril de 2020, cuando fue despedida. En específico, arguyó que fue despedida por alegadamente haber violentado el protocolo de seguridad de COVID-19 establecido por Amgen. El referido protocolo disponía, entre otras cosas, que si un empleado de Kelly o de Amgen tuvo contacto o exposición con alguien contagiado con COVID-19, debía reportarlo inmediatamente a su supervisor y al dispensario clínico de Amgen. Por esto, la parte apelante alegó que no violó protocolo alguno, y que Amgen retuvo a otros trabajadores de menor edad realizando la misma labor, razón por la cual su despido fue injustificado y discriminatorio.

El **18 de junio de 2021**, Amgen contestó la querella,[3] y en esencia, negó las alegaciones de la señora Pedraza Abreu y sostuvo que esta no era su empleada, sino empleada temporera de Kelly Services. Por lo cual, arguyó que la parte apelante no era acreedora de las disposiciones de la Ley Núm. 80 de 30 de mayo 1976, según enmendada, conocida como la *Ley sobre Despidos Injustificados* (en

---

[2] Ley Núm. 80 de 30 de mayo de 1976, según enmendada, conocida como la *Ley sobre Despidos Injustificados*, 29 LPRA sec. 185a, *et seq.*; Ley Núm. 100 de 30 de junio de 1959, según enmendada, conocida como la *Ley Antidiscrimen de Puerto Rico*, 29 LPRA sec. 146, *et seq.*; Ley Núm. 2 de 17 de octubre de 1961, según enmendada, conocida como la *Ley de Procedimiento Sumario de Reclamaciones Laborales*, 32 LPRA sec. 3118, *et seq.*
[3] Apéndice 3 del Recurso de Apelación, págs. 13-21

adelante, Ley Núm. 80).[4] Añadió que la terminación de la asignación del empleo fue justificada por incumplimiento con el protocolo de seguridad de COVID-19 y no tuvo ningún carácter discriminatorio.

Por su lado, el **25 de julio de 2021** Kelly Services contestó la querella de manera similar a Amgen; en síntesis, adujo que el despido fue justificado por violentar el protocolo de COVID-19 de Amgen.[5] De igual forma, cuestionó la aplicabilidad de la Ley Núm. 80, ya que la parte apelante era una empleada temporera a tiempo determinado.

Tras varios trámites procesales, entre los cuales incluyó una deposición a la señora Pedraza Abreu como parte del descubrimiento de pruebas,[6] Kelly Services y Amgen presentaron sendas mociones de sentencia sumaria el **12 y 19 de septiembre de 2022**, respectivamente.[7]

Por su parte, Kelly Services propuso cuarenta y uno (41) hechos materiales incontrovertidos, mientras que Amgen propuso cuarenta y cinco (45). En síntesis, ambas partes aludieron a que no existía controversia en cuanto a los siguientes hechos materiales:

1. Que la señora Pedraza admitió estar consciente de que su trabajo era uno de carácter temporero;[8]

2. Que la señora Pedraza admitió que, de cometer alguna violación a las normas de Amgen o de Kelly, su asignación de empleo podía terminar;[9]

3. Que la señora Pedraza admitió conocer que Amgen estableció un protocolo de seguridad de COVID-19;[10]

4. Que Amgen advino en información confidencial a los efectos de que el padre de los hijos de la señora Pedraza estuvo contagiado con COVID-19 para el mes de abril de 2020;[11]

---

[4] 29 LPRA sec. 185a, *et seq.*
[5] Apéndice 4 del Recurso de Apelación, págs. 22-34.
[6] Apéndice 5 del Recurso de Apelación, págs. 68-263.
[7] Apéndice 5 y 6 del Recurso de Apelación, págs. 35-302, 303-325.
[8] *Íd.*, págs. 42, 306.
[9] *Íd.*, págs. 43, 306.
[10] *Íd.*, págs. 44, 307.
[11] *Íd.*, págs. 45, 308.

**5.** Que los hijos de la señora Pedraza, quienes convivían junto a ella, tuvieron contacto con su padre para el mes de abril de 2020;[12]

**6.** Que la señora Pedraza y sus hijos se realizaron pruebas de detección de COVID-19;[13]

**7.** Que la señora Pedraza no reportó lo anterior a Amgen ni a Kelly Services, en violación al protocolo de seguridad;[14]

**8.** Que la señora Pedraza admitió que, luego de la terminación de su asignación de empleo, permanecieron empleados de su misma edad, e inclusive, mayores que ella, trabajando en Amgen.[15]

Así, Kelly Services acompañó su moción con los siguientes documentos: **(1)** *Deposición de la señora Maribel Pedraza Abreu, tomada el 26 de agosto de 2021 (junto con sus respectivos exhibits);*[16] **(2)** *Declaración Jurada de la señora Milagros Rosado, directora de Recursos Humanos de Kelly Services;*[17] **(3)** *Manual para empleados de Kelly Services;*[18] **(4)** *Correo electrónico del 17 de marzo de 2020;*[19] **(5)** *Correo electrónico del 3 de abril de 2020.*[20]

Por su lado, Amgen acompañó su moción con los siguientes documentos: **(1)** *Deposición de la señora Maribel Pedraza Abreu (junto con sus respectivos exhibits);*[21] **(2)** *Declaración jurada de la señora Yolanda S. Ortiz Quiñones, Senior Manager, Human Resources Business Partner de Amgen (acompañada de Anejo B (Políticas de 'Do the Right Thing,' sobre empleados externos, e igualdad en el empleo) y Anejo C (Cadena de correos electrónicos de abril-mayo 2020));*[22] **(3)** *Declaración jurada del señor Misael Rosario, Senior Manager Manufacturing de Amgen;*[23] **(4)** *Declaración jurada del señor Luis Piñeiro, Manager Manufacturing de Amgen;*[24] **(5)**

---

[12] *Íd.*, págs. 45, 309.
[13] *Íd.*
[14] *Íd.*
[15] *Íd.*, págs. 46, 310.
[16] Apéndice 5 del Recurso de Apelación, págs. 68-263.
[17] *Íd.*, págs. 264-266.
[18] *Íd.*, págs. 271-298.
[19] *Íd.*, págs. 267-270.
[20] *Íd.*, págs. 299-302.
[21] Apéndice 6 del Recurso de Apelación, págs. 68-263.
[22] *Íd.*, págs. 326-411.
[23] *Íd.*, págs. 412-413.
[24] *Íd.*, págs. 414-415.

*Declaración jurada de la señora Lilliam Nistal, Senior Manager, Occupational Health de Amgen (acompañada con Anejo A ([D]ocumentos y notas médicas del 25 y el 27 de abril de 2020);*[25] **(6)** *Declaración jurada de la señora Milagros Paola Perfetto, Senior Manager, External Workforce Center de Amgen (acompañada con Anejo A (Expediente de external worker de Pedraza);*[26] **(7)** *Producción Consolidada,*[27] y **(8)** *External Workforce Policy.*[28]

Asimismo, ambas partes presentaron argumentos similares a los efectos de que no era de aplicación la Ley Núm. 80, toda vez que la señora Pedraza Abreu era una empleada temporera asignada por términos fijos y la terminación de su empleo estuvo justificada al violentar el protocolo de seguridad de COVID-19. También, arguyeron que la parte apelante no estableció de manera *prima facie* que la terminación de su asignación de empleo haya sido discriminatoria por razón de su edad.

El **18 de noviembre de 2022**, la señora Pedraza Abreu presentó *Oposición a solicitud de sentencia sumaria presentada por Kelly* y *Oposición a solicitud de sentencia sumaria presentada por Amgen.*[29] En ambas, aceptó que no existía controversia sobre los siguientes hechos medulares: **(1)** que fue contratada por Kelly Services como empleada temporera;[30] **(2)** que fue asignada a trabajar para Amgen, una compañía cliente de Kelly Services;[31] **(3)** que Amgen estableció ciertos protocolos de seguridad de COVID-19 entre los cuales se disponía que cualquier persona que tuviera síntomas o hubiese estado expuesto a alguien contagiado con COVID-19, debía reportarlo inmediatamente a sus supervisores;[32]

---

[25] *Íd.,* págs. 416-430.
[26] *Íd.,* págs. 431-454.
[27] *Íd.,* págs. 455-476.
[28] *Íd.,* págs. 477-496.
[29] Apéndices 10 y 11 del Recurso de Apelación, págs. 504-543, 544-568.
[30] *Íd.,* págs. 508, 548.
[31] *Íd.,* págs. 506, 549.
[32] *Íd.,* págs. 515, 550-551.

**(4)** que fue notificada de los referidos protocolos por correo electrónico;[33] y, **(5)** que luego de su remoción de la asignación de empleo, permanecieron empleados de su misma edad, e inclusive, mayores que ella, trabajando en Amgen.[34]

No obstante, la parte apelante señaló como controversias de hechos: **(1)** que sus hijos hayan tenido contacto con su padre mientras éste, aparentemente, estuvo contagiado con COVID-19, y **(2)** que le haya omitido a la parte apelada que ella y sus hijos se realizaron pruebas de contagio de COVID-19. Por consiguiente, adujo que no violentó protocolo alguno, por lo que su despido fue injustificado.

En su escrito en oposición a la solicitud presentada por Kelly Services, además de hacer referencia a los anejos que se acompañaron en la solicitud, la señora Pedraza Abreu lo complementó con los siguientes documentos: **(1)** *Contrato de Empleo Temporero y Récord de las Asignaciones de Empleo;*[35] **(2)** *Gráficas de Defunciones por COVID-19 en Puerto Rico durante el período del 17 de marzo de 2020 al 31 de marzo de 2020;*[36] **(3)** *Monitoreo de COVID-19 en Puerto Rico durante el período de 12 de marzo de 2020 al 31 de marzo de 2020;*[37] **(4)** *Correos electrónicos notificando protocolos de COVID-19 el 12, 16 y 24 de marzo de 2020;*[38] y **(5)** *Correos electrónicos del 28 de abril de 2020.*[39]

Por último, la señora Pedraza Abreu arguyó en ambos escritos de oposición que no procedía la disposición sumaria del caso porque los hechos que la parte apelada propuso como incontrovertidos, se basaban en prueba inadmisible en evidencia y cuyo valor probatorio

---

[33] *Íd.*, págs. 516-517, 550-551.
[34] *Íd.*, págs. 525, 561.
[35] Apéndice 10 del Recurso de Apelación, pág. 534.
[36] *Íd.*, pág. 536.
[37] *Íd.*, págs. 540-542.
[38] *Íd.*, págs. 538-539.
[39] *Íd.*, pág. 543. Cabe indicar que no surge del expediente que la señora Pedraza Abreu haya acompañado con anejos su escrito de oposición a la solicitud presentada por Amgen, sino que se limitó a referirse a los anejos con los que Kelly Services y Amgen acompañaron sus respectivas mociones de sentencia sumaria.

dependía de un examen en un juicio en su fondo. Esto por cuanto la confidencia que recibió la parte apelada sobre la posible violación al protocolo de seguridad constituía prueba de referencia, y la adjudicación del caso dependía de la determinación de elementos subjetivos como la intencionalidad y motivación al actuar. Además, que la parte apelada pretendió evadir el cumplimiento de la Ley Núm. 80 y la Ley Núm. 100 de 30 de junio de 1959, según enmendada, conocida como la *Ley Antidiscrimen de Puerto Rico* (en adelante, "Ley Núm. 100"),[40] utilizando como base el contrato de empleo temporero; lo anterior, en contravención con el Artículo 4 de la *Ley para Reglamentar la Contratación de Empleados Temporeros a través de Compañías de Servicios Temporeros*, (en adelante, "Ley 26-1992").[41]

El **18 de agosto de 2023**, tras evaluar los escritos de todas las partes, el TPI acogió las solicitudes de la parte apelada y determinó que los siguientes hechos no estaban en controversia:

### *Hechos propuestos por la parte QUERELLADA KSI*

1. *KSI es una Compañía que, entre otras cosas, ofrece soluciones de empleo y consultoría en el área de recursos humanos a nivel global, incluyendo asignar empleados temporeros en compañías-clientes. A tales fines, KSI tiene distintos clientes en Puerto Rico, siendo uno de ellos AML.*
2. *AML es una compañía multinacional dedicada a la biociencia que tiene una planta en el Municipio de Juncos, Puerto Rico.*
3. *La Querellante trabajó para KSI mediante un contrato bona fide de empleo temporero asignada en AML en su planta ubicada en el Municipio de Juncos, Puerto Rico desde el 26 de febrero de 2018. KSI le pagaba a la señora Pedraza los salarios como empleada temporera, así como cualquier beneficio de ley aplicable, y no es quién controla los términos y condiciones de la asignación. KSI no determina las áreas dónde los empleados temporeros son asignados, los departamentos, turnos, requisitos de las posiciones ni tampoco las funciones de las mismas.*

---

[40] 29 LPRA sec. 146, *et seq.*
[41] Ley Núm. 26 de 22 de julio de 1992, conocida como la *Ley para Reglamentar la Contratación de Empleados Temporeros a través de Compañías de Servicios Temporeros*, 29 LPRA sec. 575c.

4. *La Querellante, la señora Pedraza Abreu, ocupó en todo momento durante su asignación en AML la posición de Operadora de inspección y empaque en el segundo turno.*

5. *Antes de comenzar su asignación en AML, la Querellante llenó una solicitud de empleo con KSI. La señora Pedraza admitió durante su deposición que la información que escribió en dicha solicitud es cierta, completa y correcta.*

6. *La Querellante declaró en su deposición que estaba consciente que KSI asigna a sus empleados temporeros a trabajar en compañías-clientes a base de la disponibilidad de ofertas, las necesidades de los clientes, destrezas, cualificaciones y habilidades del candidato o empleado.*

7. *La Querellante firmó el 29 de enero de 2018 un documento intitulado "Acuerdo solicitantes en Puerto Rico únicamente". En dicho documento se le señala: "Entiendo que Kelly Services, Inc., puede ofrecerme un empleo sujeto a mi disponibilidad para trabajar, la capacidad de Kelly para encontrarme un puesto adecuado y los resultados de la comprobación de referencia u otras condiciones. Mi término de empleo con Kelly no está garantizado. Tanto Kelly como yo podemos poner fin a la relación laboral en cualquier momento, con motivo o sin ellos, sujeto a las leyes aplicables. La duración de cualquier puesto que yo acepte depende de la necesidad del cliente de Kelly y puede ser cancelado en cualquier momento por Kelly o por el cliente."*

8. *Dicho documento también establece: "Tan pronto termine cada asignación, notificaré a Kelly mi disponibilidad para trabajar. Entiendo que tengo la responsabilidad de mantener contacto con Kelly semanalmente. El no contactar a Kelly puede afectar mi elegibilidad para beneficios por desempleo. Entiendo que una vez haya completado mi asignación me mantendré como candidato siendo elegible para reempleo, a no ser que se me haya colocado en otra asignación. Entiendo también que podría ser elegible para reempleo."*

9. *La Querellante admitió durante la deposición que cuando solicitó empleo a KSI, estaba consciente que estaba solicitando un empleo de carácter temporero.*

10. *KSI no es quién controla los términos y condiciones de la asignación. Así, la Querellante reconoció en su deposición que KSI no determina las áreas donde los empleados temporeros son asignados, los departamentos, turnos, requisitos de las posiciones ni tampoco las funciones de las mismas.*

11. *La Querellante, la señora Pedraza Abreu, admitió en la deposición que recibió copia del Manual de empleados de KSI y se familiarizó con las normas, políticas y procedimientos de KSI.*

12. *La señora Pedraza Abreu respondió en su deposición que sí sabía que, si cometía alguna violación a las normas, políticas y/o procedimientos de KSI o de la*

*compañía cliente AML, su asignación de empleo temporero podía terminar.*

13. *La señora Pedraza Abreu admitió tener conocimiento de que tanto KSI como AML tienen una política en contra del discrimen en el empleo.*

14. *La Querellante mantuvo una relación cordial de trabajo con los supervisores de AML. Nunca tuvo problema alguno con ellos ni tiene queja alguna con respecto a ellos; entiende son personas serias y honestas.*

15. *La señora Pedraza Abreu admitió que tuvo una relación cordial de trabajo con las coordinadoras de KSI asignadas a la planta de AML que servían de enlace entre los empleados temporeros y KSI. La Querellante admitió, además, en su deposición que las coordinadoras de KSI asignadas a AML eran las personas a quienes debía reportar cualquier inquietud, duda, inconformidad o queja en su asignación en la compañía-cliente, que ambas coordinadoras estuvieron siempre accesibles a ella y que tenía sus números de teléfono. La Querellante entiende que son personas serias y honestas.*

16. *La señora Pedraza admitió en su deposición que durante su asignación de empleo temporero estuvo siempre conforme con los términos y condiciones de su trabajo.*

17. *Previo a la presentación de esta QUERELLA y durante su asignación de empleo temporero en AML, la Querellante nunca se quejó de discrimen.*

18. *La señora Pedraza Abreu admitió que, para el mes de marzo de 2020, cuando surge la crisis de la pandemia del COVID-19, no había una vacuna contra dicha enfermedad.*

19. *La Querellante admitió que para marzo de 2020 el Covid-19 estaba cobrando la vida de cientos de personas a través de todo el mundo, y que Puerto Rico no era la excepción, en dónde ya se habían contagiado cientos de personas, cobrando vidas.*

20. *La señora Pedraza Abreu admitió que AML es una compañía altamente reglamentada a la cual le aplican las buenas prácticas de manufactura y Documentación o "GMPs" por sus siglas en Inglés.*

21. *Además, la señora Pedraza Abreu reconoció que para marzo de 2020 había mucha incertidumbre con respecto a qué iba a pasar con el COVID-19 y en todos los trabajos las compañías estaban siendo bien celosas con la seguridad de sus empleados.*

22. *La señora Pedraza Abreu admitió durante su deposición que tanto KSI como AML tenían un interés apremiante en proteger a sus empleados y operaciones, y en el caso particular de AML, también tenía interés apremiante en proteger su producción.*

23. *La señora Pedraza Abreu reconoció en su deposición que por ello (interés apremiante) AML estableció unas políticas de seguridad para lidiar con la emergencia del COVID-19.*

24. *Entre otras cosas, AML estableció que cualquier persona que tuviera síntomas de COVID-19 o hubiese*

*tenido algún contacto o exposición con alguien contagiado con COVID-19, debía reportarlo inmediatamente, tanto al supervisor de AML como al dispensario médico, ello para proteger a los empleados y la producción. Además, la política de prevención de contagio establecida por AML requería que, si el empleado tenía síntomas y se encontraba en la planta, debía reportarlo inmediatamente y abandonar la planta, y de no encontrarse en la planta, no debía ni presentarse en la planta y debía comunicarse inmediatamente con el dispensario, así como con el supervisor. Además, en el caso de los empleados temporeros de KSI, debían reportarlo al supervisor de KSI.*

25. *El 17 de marzo de 2020 la Querellante recibió un correo electrónico de parte de Dorylee Dávila, coordinadora de KSI a empleados asignados por KSI a AML sobre las instrucciones de seguridad impartidas por dicha compañía cliente con relación a la prevención de contagio del COVID-19. Dicho correo electrónico dispone, entre otras cosas, que: "Recuerde si presenta los síntomas de Covid-19, tos, fiebre, cansancio, dificultad para respirar, estando en su casa, por favor no venga a AML, busque atención médica de inmediato y comuníquese con su supervisor".*

26. *Dicho correo electrónico del 17 de marzo de 2020 también señala: "Es importante recalcar, que si usted o sus familiares estuvieron en un área con personas con síntomas de Covid-19, o presentan estos síntomas mientras están en casa, **deben buscar atención médica de inmediato, comuníquese con nuestra clínica de salud ocupacional, llamando al 787-916-5557 y comuníquese con su supervisor**". Posteriormente, el 3 de abril de 2020, AML envió un correo electrónico a los empleados con las mismas instrucciones antes descritas. La señora Pedraza Abreu depuso que ella accedía el correo electrónico provisto por AML cuando le daban autorización en la línea para ello.*

27. *La Querellante admitió durante su deposición que no reportó tan pronto se hizo los laboratorios, ni a AML ni a KSI, que tanto ella como sus dos (2) hijos se habían realizado la prueba de detección de COVID-19 el día 23 de abril de 2020. Les envió copia de sus resultados el 26 de abril de 2020, todas con resultados negativos.*

28. *AML tenía "información confidencial" a los efectos de que el padre de los hijos de la Querellante estuvo contagiado con COVID-19 para el mes de abril de 2020. La señora Pedraza Abreu admitió que sus hijos tuvieron contacto con su padre en el mes de abril de 2020. Surge de la deposición lo siguiente:*

*P. No. Le pregunto si es o no correcto que para abril del 2020 -- y le recuerdo que está bajo juramento, que mentir bajo juramento conlleva unas penalidades muy severas, sus hijos tuvieron contacto con su esposo.*

*R. Mi nena --*

*P. Sí.*

*R. Ellos no tenían contacto con su papá.*

*P. ¿Desde cuándo?*

*R. Ellos hablan por teléfono.*

*P. Escuche la pregunta. No le estoy hablando ahora. Le estoy hablando para abril del 2020, si es o no correcto que sus hijos, los dos, o cualquiera de ellos, tuvo contacto con su ex compañero.*

*R. Correcto*

*P. ¿Y eso fue para abril del 2020? ¿verdad que sí?*

*R. Correcto*

29. *La Querellante declaró durante su deposición que el 30 de abril de 2020 las coordinadoras de KSI, Dorylee Dávila y Janet Morales, se comunicaron con ella por teléfono para notificarle que AML había tomado la decisión de terminar su asignación porque, según AML, la señora Pedraza Abreu había violentado los protocolos de seguridad de AML y había expuesto y puesto en peligro la vida de sus compañeros de trabajo, al haberse realizado la prueba de COVID-19 y haber ido a trabajar sin conocer los resultados, ni notificar a KSI ni a AML que se había hecho dicha prueba. La Querellante también depuso que en ningún momento KSI le entregó una carta de despido ni le indicó que estaba siendo despedida.*

30. *La señora Pedraza Abreu indicó en su deposición que no sabe quién o quiénes en AML tomaron la determinación de removerla de la asignación.*

31. *La señora Pedraza Abreu indicó, además, que tampoco conoce cuándo se tomó la determinación de removerla de la asignación.*

32. *Luego que la Querellante terminó su asignación de empleo temporero con AML el 30 de abril de 2020, nunca volvió a las facilidades de AML ni de KSI. Además, la señora Pedraza Abreu depuso que luego de dicha fecha tampoco ha hablado con empleados ni ex empleados de AML ni de KSI.*

33. *La señora Pedraza Abreu declaró durante su deposición que, luego de la conversación del 30 de abril de 2020 con las coordinadoras de KSI, no se ha vuelto a comunicar con KSI para fines de otras asignaciones porque "no quiere volver a trabajar en fábricas".*

34. *La señora Pedraza Abreu expresó durante su deposición que, luego del 30 de abril de 2020, continuó realizando el trabajo esporádico por cuenta propia como técnico de uñas, el cual tenía previo a dicha fecha, y también cobró los beneficios del desempleo por un año. Surge de la deposición que la señora Pedraza Abreu no informó al Departamento del Trabajo de su trabajo esporádico por cuenta propia.*

35. *Para sostener su reclamación de discrimen por razón de edad y despido injustificado, la Querellante alega que, luego de su remoción de la asignación antes de que culminara el contrato, permanecieron trabajando en AML empleados menores que ella en iguales puestos al que ella ocupaba. La Querellante tenía 41 años al momento en que fue removida de la asignación con AML.*

36. *La Querellante, la señora Pedraza Abreu expresó en su deposición que ella sabía que, si se cometía alguna violación a las normas de KSI o de AML, podía terminar la asignación de empleo temporero, incluso antes que el Contrato venciera por sus propios términos.*

37. *La Querellante declaró en su deposición que, luego de la remoción de su asignación de empleo temporero, permanecieron trabajando en AML empleados de su misma edad, así como también mayores que ella.*

38. *La señora Pedraza Abreu no sabe si los empleados que se quedaron trabajando en AML, sobre los cuales alega que son menores que ella, se hicieron una prueba de COVID-19 y no lo notificaron a la compañía.*

39. *La Querellante admitió que nunca ha visto los certificados de nacimiento de los empleados que ella alega son menores que ella.*

### *Hechos propuestos por la parte QUERELLADA AML*

1. *AML es una compañía biofarmacéutica dedicada a la manufactura de productos farmacológicos para el consumo humano.*

2. *KSI es una compañía que "se dedica a proveer servicios de empleo y consultoría a nivel global en el área de recursos humanos, incluyendo satisfacer las necesidades de empleo temporero en Puerto Rico de varias entidades que denomina "compañía cliente"".*

3. *AML tiene diversas políticas en contra del discrimen en el empleo incluyendo el discrimen por razón de edad.*

4. *AML, asimismo, tiene una política centrada explícitamente a los empleados temporeros, como la querellante (referidos como "external workers") titulada "External Workforce Policy" (en adelante, "EW Policy").*

5. *El EW Policy de AML define "external workers" como aquellos empleados cuya función es potenciar la empleomanía de AML temporeramente y es clara: "[e]xternal workers are not Amgen employees".*

6. *Además, dicha política explica que los "external workers" se adquieren por medio de una compañía suplidora, como en este caso KSI.*

7. *El 6 de febrero de 2018, la señora Pedraza Abreu llenó y firmó una solicitud de empleo con KSI.*

8. *Al inicio de su empleo con KSI, la Querellante recibió, leyó y firmó un Acuerdo – Solicitantes en Puerto Rico Únicamente y un Acuse de Recibo del Manual para Empleados ("Acuerdo").*

9. *El Acuerdo firmado por la Querellante, dispone que "'el cliente(s)' y 'cliente potencial(es)' de Kelly se entenderá como cualquier entidad a la que se me ha asignado por Kelly […]". El mismo además dispone que: "Relaciones*

*laborales – Entiendo que no soy empleado de ningún cliente al cual Kelly me asigne, independientemente de cualquier declaración, conducta, o creencia del cliente."* Por último, se estipula que la asignación *"puede ser cancelad[a] en cualquier momento por Kelly o por el cliente".*

10. La Querellante reconoció en su deposición que, por virtud del Acuerdo firmado, ella conocía que al solicitar empleo en KSI se trataba de un empleo temporero.

11. El Acuse de Recibo del Manual para Empleados, firmado por la Querellante, por su parte establece que *"[u]n empleo con Kelly no implica ni garantiza un puesto regular en ninguna compañía."* El referido documento añade lo siguiente:

> *"Voy a seguir todas las políticas y procedimientos de Kelly […], así como los de cualquier cliente de Kelly al que se me asigne. Entiendo que la violación a estas políticas puede resultar en medidas disciplinarias que lleven a terminación de empleo."*

12. KSI y la Querellante también suscribieron un contrato de empleo, titulado Contrato de empleo temporero, mediante el cual la Querellante aceptó trabajar *"como empleada temporera con cualquier compañía cliente de Kelly."*

13. El Contrato de empleo temporero, referido en el párrafo anterior, dispone:

> *"Entiendo que mi patrono es Kelly Services, quien es responsable de los pagos de mi salario y otros beneficios dispuestos por ley. Reconozco que mi trabajo es de carácter temporero y que no se me ha ofrecido expectativa de convertirme en empleado regular de la compañía cliente de Kelly".*

14. Por virtud de dicho contrato de empleo temporero, la Querellante fue asignada a trabajar en las facilidades de AML comenzando el 26 de febrero de 2018 por un término de entre dos a tres meses.

15. Posteriormente, la Querellante firmó varios contratos similares con KSI renovando su asignación a AML en 10 ocasiones por términos similares, siempre menores de seis meses. La última renovación tenía fecha del 3 de enero de 2020 al 4 de septiembre de 2020.

16. La Querellante trabajó en las facilidades de AML hasta el 30 de abril de 2020.

17. El Sr. Luis Piñeiro, Mgr. Manufacturing, era el supervisor del área a la cual estaba asignada la querellante al momento de la terminación de su asignación temporera en AML.

18. Durante su asignación temporera en AML por medio de KSI, la Querellante trabajó como empleada no exenta.

19. La Querellante admitió en su deposición que, para el mes de marzo del 2020, al inicio de la crisis de salud [Pandemia] del COVID-19, no existía ni vacuna ni tratamiento para dicha enfermedad.

20. *En su deposición, la Querellante admitió, además, que para marzo del 2020 existía incertidumbre en cuanto a qué iba a suceder con el COVID-19 y todas las compañías estaban sumamente celosas con la seguridad de sus empleados.*

21. *Durante su asignación temporera en AML por medio de KSI, la Querellante tenía un correo electrónico en AML el cual revisaba y al cual tenía acceso cuando la autorizaban.*

22. *El 17 de marzo de 2020 la Querellante recibió un correo electrónico de Dorylee Dávila Rojas, empleada y coordinadora de KSI, titulado "Recordatorio – Síntomas COVID-19".*

23. *En el correo electrónico del 17 de marzo de 2020 que recibió la Querellante expresaba "MESSAGE FROM AMGEN NOTIFICATION SYSTEM" mediante el cual se recordaba que si usted o sus familiares estuvieron en un área con personas con síntomas de COVID-19 o presentan estos estos síntomas mientras están en su casa debían buscar atención médica inmediata y comunicarse con su supervisor.*

24. *Asimismo, AML envió un correo electrónico el 3 de abril de 2020 de parte de AML Communications titulado "Instrucciones Generales sobre el Proceso de Toma de Temperatura de AML".*

25. *En el correo electrónico del 3 de abril de 2020 se hace eco del recordatorio sobre los pasos a seguir si la persona presenta síntomas de COVID-19 y se expresa que, de ser ese el caso, "busque atención médica de inmediato, comuníquese con su supervisor y por favor, no venga a AML".*

26. *El sábado 25 de abril de 2020 la Querellante se presentó a trabajar en las facilidades de AML en la Línea 307.*

27. *La línea 307 es una línea de inspección manual de viales y jeringuillas llenas de producto, en la que trabajan hasta 33 empleados a distancia cercana. Para abril de 2020, cualquier exposición a COVID-19 de cualquier empleado podría resultar en la remoción de empleados de la línea y la desinfección y sanitización del área, con la consecuente paralización del proceso en la misma.*

28. *Ese mismo día 25 de abril de 2020, el Sr. Misael Rosario, Sr. Mgr. Manufacturing, ("Sr. Rosario") recibió información confidencial sobre que la Querellante había tenido contacto primario con una persona con síntomas de COVID-19. No se identificó la fuente de la información.*

29. *Ese mismo día del 25 de abril de 2020 la Querellante fue removida de su turno.*

30. *Tanto el Sr. Luis Piñeiro, como el personal de Environment, Health and Safety/Occupational Health (EHS/OH) de AML, específicamente por la Sra. Lilliam Nistal Vargas, fueron contactados para iniciar el aislamiento inmediato de la Querellante. AML inició de inmediato su aislamiento y comenzó la limpieza y desinfección del área, conforme al protocolo establecido.*

31. *Asimismo, el 25 de abril de 2020, Yolanda Ortiz Quiñones, Sr. Manager, HR en AML, y Human Resources Business Partner ("HRBP"), le escribió un correo electrónico al External Workforce Center PR, copiando a Iris Mabel García ("Sra. García"), empleada de KSI, notificando el recibo de información sobre el posible contagio primario de la Querellante y que la Querellante había sido aislada inmediatamente.*

32. *Los hijos de la Querellante viven bajo su mismo techo y conviven con ella.*

33. *La Querellante explicó durante su deposición, que el Sr. Julio Velázquez-Martínez, padre de sus hijos, mantiene relación mayormente por teléfono, con los hijos en común (de 20 y 21 años de edad) y tienen contacto esporádico. La señora Pedraza Abreu indicó en su deposición que para abril del 2020 su hija tuvo contacto con su padre.*

34. *Antes del 25 de abril de 2020, cuando AML recibió la información sobre la posible exposición a COVID-19 de la Querellante, ésta no le había notificado a AML o KSI el hecho de que ella y sus hijos se habían realizado la prueba de COVID-19.*

35. *Luego de que se removiera a la querellante de su área de trabajo, ella envió a la clínica de AML los resultados de la prueba de COVID-19 de ella y sus hijos. Posteriormente, envió los resultados de la prueba que se realizó el padre de sus hijos, el Sr. Julio Velázquez-Martínez.*

36. *Surge de la deposición de la señora Pedraza Abreu y de documentos que constan en el expediente, que el 22 de abril de 2020 el Sr. Velázquez Martínez se realizó la prueba del COVID-19. También surge que, al día siguiente, el jueves 23 de abril de 2020, tanto la Querellante como sus hijos se realizaron pruebas de COVID-19. Todos los laboratorios resultaron "no reactivo" al COVID-19.*

37. *Posteriormente, el 27 de abril de 2020, enfermería examinó a la Querellante en el dispensario de AML y la autorizó a regresar a la línea ("return to work"). La Querellante trabajó normalmente en la línea el lunes 27, martes 28 y miércoles 29 de abril de 2020.*

38. *El 28 de abril de 2020, Yolanda Ortiz Quiñones ("Ortiz"), Human Resources Business Partner (HRBP) de AML, recibió un correo electrónico de la Sra. Mabel García, KSI Operation Manager, notificando la respuesta de Dorylee Dávila, Talent Advisor de KSI, referente al caso de la Querellante. A través de este correo le explicaba a AML que se reunieron con la Querellante y que esta había negado haber tenido alguna exposición ni real ni posible al COVID-19, que tampoco tuvo el COVID-19, ni síntomas relacionados y que ella se había realizado los laboratorios de forma preventiva, siendo ella misma quien le solicitó el referido al doctor de su hija. Indicaron que se había autorizado su regreso a la planta.*

39. *El 29 de abril de 2020, la señora García, en respuesta al mensaje anterior, envió un correo electrónico a la señora Dávila de KSI indicando que no estaban de*

*acuerdo con la medida tomada con la Querellante y solicitó reconsideración explicando lo siguiente:*

*"-La EW ["external worker"] afirmó que ella y su familia se hicieron la prueba de COVID-19, lo que confirma claramente que sabía que ella y su familia tuvieron exposición a contagio. Nos enteramos porque un compañero hizo la confidencia, de otra forma, jamás nos hubiéramos enterado de esta situación por la EW.*
*-Desde el momento que ella sospechó que tuvo exposición debió haberlo notificado y no llegar a la planta hasta que hiciéramos el manejo correspondiente.*
*-Ocultó información y no siguió el protocolo que se estableció en estos casos. Independientemente de los resultados de la prueba, si ella lo hubiera informado antes de llegar al Site hubiera sido otro escenario, sin embargo, lo no lo informó.*
*-La EW no ignoraba el protocolo, debido a que todo el personal de AML1 fue adiestrado sobre esto desde que comenzamos con la situación de COVID-19.*
*-No se puede perder de perspectiva lo que se está poniendo riesgo. Los laboratorios siguen un protocolo para realizar las pruebas por la escasez de las mismas. El área estuvo el fin de semana desinfectando y limpiando el área."*

40. *El 29 de abril de 2020, luego de re-evaluar el caso de la querellante, KSI decidió terminar la asignación temporera de la Querellante con AML y así se lo informó la señora Dávila a la señora García mediante correo electrónico.*

41. *El 30 de abril de 2020, KSI notificó a AML que en ese día le notificó a la Querellante sobre la terminación de su contrato de empleo temporero con relación a su asignación en AML.*

42. *Durante el periodo pertinente a esta reclamación, la Querellante tenía 41 años.*

43. *La Querellante no conoce la edad ni los nombres de los empleados que alegadamente se quedaron trabajando luego de la terminación de su asignación temporera en AML.*

44. *La Querellante reconoció que luego de la terminación de su asignación temporera, AML mantuvo a empleados de igual edad que ella, e inclusive de mayor edad que la querellante, y que la mayoría de los empleados que estaban en su línea eran todos menores que ella.*

45. *Asimismo, la Querellante desconoce la edad del Sr. Luis Piñeiro ni del Sr. Misael Rosario ni de algún otro supervisor de AML.*

46. *El Sr. Luis Piñeiro, el Sr. Misael Rosario y la Sra. Yolanda Ortiz son todos mayores que la Querellante. El Sr. Luis Piñeiro y el Sr. Misael Rosario actualmente tienen 47 años y la Sra. Yolanda Ortiz tiene 56 años.*[42]

---

[42] Apéndice 28 del Recurso de Apelación, págs. 648-684.

A tono con lo antes dicho, el TPI dictó sentencia sumaria y desestimó la querella presentada por la señora Pedraza Abreu. En síntesis, determinó que no eran de aplicación las disposiciones de la Ley Núm. 80 dado a que el contrato de empleo era uno de carácter temporero;[43] y que no se estableció de manera *prima facie* un caso de discrimen por razón de edad, ya que la apelante no presentó hechos fácticos conducentes a discrimen y, en la toma de su deposición, admitió que en el empleo permanecieron empleados tanto mayores como menores que ella.[44] Además, concluyó que la terminación de la asignación de empleo fue un ejercicio razonable de la parte apelada para el buen manejo y funcionamiento empresarial, ya que la omisión de notificar inmediatamente la sospecha de contagio de COVID-19 y que se realizó una prueba, constituyó una violación por parte de la señora Pedraza Abreu al protocolo de seguridad establecido por Amgen. [45] Finalmente, resolvió que la señora Pedraza Abreu no controvirtió con prueba admisible los hechos esenciales propuestos como incontrovertidos por la parte apelada, sino que descansó en inferencias y su versión de los hechos.[46]

Inconforme, el **1 de septiembre de 2023**, la señora Pedraza Abreu acude a este foro intermedio y nos señala la comisión de los siguientes errores:

> ***Primero****: Declarar ha lugar las mociones de sentencia sumaria presentadas por las apeladas y dictar sentencia sumariamente contrario a derecho puesto que sustentó su sentencia en prueba documental inadmisible y en manifestaciones inadmisibles por constituir ambas prueba de referencia.*

> ***Segundo****: Declarar ha lugar las mociones de sentencia sumaria presentadas por las apeladas y dictar sentencia sumariamente en la que desestimó todas las reclamaciones del apelante, a pesar de existir controversias de hechos esenciales, que impiden disponer de este pleito sumariamente, respecto al*

---

[43] *Íd.,* págs. 677-678.
[44] *Íd.,* págs. 678-679.
[45] *Íd.,* pág. 683.
[46] *Íd.,* págs. 683-684.

*incidente que las apeladas alegaron como causa para el despido.*

El **21 de febrero de 2025,** comparecieron tanto Kelly Services como Amgen mediante sendos alegatos en oposición al recurso de apelación. Así, damos por perfeccionado el recurso.

**-II-**

**-A-**

La Regla 36 de Procedimiento Civil regula el mecanismo procesal de la sentencia sumaria,[47] cuyo propósito principal es facilitar la solución justa, rápida y económica de casos civiles que no presentan controversias genuinas o reales sobre hechos materiales y esenciales.[48] Se considera un hecho material esencial *"aquel que puede afectar el resultado de la reclamación de acuerdo al derecho sustantivo aplicable".[49]* Por lo tanto, procederá dictar una sentencia sumaria:

> *[S]i las alegaciones, **deposiciones**, contestaciones a interrogatorios y admisiones ofrecidas, en unión a las declaraciones juradas si las hay, u otra evidencia, demuestran que no hay controversia real sustancial en cuanto a algún hecho esencial y pertinente y que[,] como cuestión de derecho[,] el tribunal debe dictar sentencia sumaria a favor de la parte promovente.[50]*

Es decir, este mecanismo podrá ser utilizado en situaciones en las que la celebración de una vista o del juicio en su fondo resultare innecesaria, debido a que el tribunal tiene ante su consideración todos los hechos necesarios y pertinentes para resolver la controversia y solo le resta aplicar el derecho.[51] De manera, que un asunto no debe ser resuelto por la vía sumaria cuando:

> *(1) existen hechos materiales y esenciales controvertidos; (2) hayan alegaciones afirmativas en la demanda que no han sido refutadas; (3) surja de los propios documentos que acompañan la moción una controversia real sobre algún*

---

[47] Regla 36 de Procedimiento Civil, 32 LPRA Ap. V, R. 36.
[48] *Bobé v. UBS Financial Services,* 198 DPR 6, 19-20 (2017).
[49] *SLG Szendrey-Ramos v. Consejo de Titulares,* 184 DPR 133, 167 (2011). *Citas omitidas.*
[50] 32 LPRA Ap. V, R. 36.3(e). *Énfasis nuestro.*
[51] *Mejías v. Carrasquillo,* 185 DPR 288, 299 (2012).

*hecho material y esencial, o **(4)** como cuestión de derecho no procede.*[52]

La precitada Regla establece los requisitos de forma que debe satisfacer toda solicitud de sentencia sumaria.[53] El inciso (a) de la Regla 36.3 de Procedimiento Civil dispone que la moción de la parte promovente deberá contener:

> **1)** *Una exposición breve de las alegaciones de las partes;*
> **2)** *los asuntos litigiosos o en controversia;*
> **3)** *la causa de acción, reclamación o parte respecto a la cual es solicitada la sentencia sumaria;*
> **4)** *una relación concisa y organizada en párrafos enumerados, de todos los hechos esenciales y pertinentes sobre los cuales no hay controversia sustancial, con indicación de los párrafos o las páginas de las declaraciones juradas u otra prueba admisible en evidencia donde se establecen los mismos, así como de cualquier otro documento admisible en evidencia que se encuentre en el expediente del tribunal;*
> **5)** *las razones por las cuales debe ser dictada la sentencia, argumentando el derecho aplicable, y*
> **6)** *el remedio que debe ser concedido.*[54]

Asimismo, presentada una moción de sentencia sumaria, la parte promovida no deberá cruzarse de brazos ni descansar exclusivamente en meras afirmaciones o en las aseveraciones contenidas en sus alegaciones.[55] Es preciso que la parte promovida formule —con prueba adecuada en derecho— una posición sustentada con contradeclaraciones juradas y contradocumentos que refuten los hechos presentados por el promovente. [56] Por consiguiente, cualquier duda que plantee sobre la existencia de hechos materiales en controversia no será suficiente para derrotar la procedencia de la solicitud.[57] Es decir, *"[t]iene que ser una duda que permita concluir que existe una controversia real y sustancial sobre hechos relevantes y pertinentes."* [58] Después de todo, *"[l]a*

---

[52] *SLG Szendrey-Ramos v. Consejo de Titulares, supra,* a la pág. 167. *Citas omitidas.*
[53] *SLG Zapata-Rivera v. JF Montalvo,* 189 DPR 414, 431 (2013).
[54] 32 LPRA Ap. V, R. 36.3 (a).
[55] *Rodríguez Méndez v. Laser Eye,* 195 DPR 769, 785 (2016).
[56] *Ramos Pérez v. Univisión,* 178 DPR 200, 214-215 (2010).
[57] *Oriental Bank v. Perapi et al.,* 192 DPR 7, 26 (2014).
[58] *Ramos Pérez v. Univisión, supra,* a la pág. 214.

*etapa procesal para presentar prueba que controvierta los hechos propuestos por una parte en su Moción de Sentencia Sumaria no es en el juicio, sino al momento de presentar una Oposición a la Moción de Sentencia Sumaria, según lo exige la Regla 36 de Procedimiento Civil".*[59]

En ese sentido, la parte promovida también tiene la obligación de cumplir con las exigencias enunciadas en las cláusulas (1), (2) y (3) del inciso (a) de la Regla 36.3 de Procedimiento Civil.[60] Le corresponde citar con especificidad cada uno de los párrafos, según enumerados en la solicitud de sentencia sumaria, que entiende se encuentran en controversia, al igual aquellos que no.[61] Dicha tarea deberá ser realizada de forma tan detallada y específica como lo haya hecho la parte promovente y haciendo referencia a la prueba admisible en la cual se sostiene la impugnación, con cita a la página o sección pertinente.[62]

Por otro lado, y pertinente al presente caso, nuestro Tribunal Supremo ha expresado que *"no es aconsejable utilizar el mecanismo de procesal de sentencia sumaria en casos donde hay elementos subjetivos, de intención, propósitos mentales o negligencia, o cuando el factor credibilidad sea esencial."*[63] En virtud de lo anterior, nuestro Foro Máximo estableció la normativa de no favorecer la adjudicación por vía sumaria de las acciones presentadas al palio de la Ley Núm. 100 por discrimen por razón de edad.[64]

Asimismo, es menester señalar que al ejercer nuestra función revisora sobre decisiones en las que se aprueba o deniega una solicitud de sentencia sumaria, nos encontramos en la misma posición que los foros de primera instancia.[65] Al tratarse de una

---

[59] *Meléndez González et al. v. M. Cuebas*, 193 DPR 100, 122 (2015).
[60] 32 LPRA Ap. V, R. 36.3 (b)(1).
[61] *SLG Zapata-Rivera v. JF Montalvo, supra*, a la pág. 432.
[62] *Íd.; Burgos López et al. v. Condado Plaza*, 193 DPR 1, 17 (2015).
[63] *Soto v. Hotel Caribe Hilton,*137 DPR 294, 301 (1994).
[64] *Íd.* a la pág. 302.
[65] *Meléndez González et al. v. M. Cuebas, supra*, a la pág. 118.

revisión de *novo*, debemos ceñirnos a los mismos criterios y reglas que nuestro ordenamiento les impone a los foros de primera instancia, y debemos constatar que los escritos de las partes cumplan con los requisitos codificados en la Regla 36 de Procedimi*ento* Civil, *supra*.[66] A tenor con lo expuesto, el Tribunal Supremo ha pautado lo siguiente:

> *[E]l Tribunal de Apelaciones debe revisar si en realidad existen hechos materiales en controversia. De haberlos, el foro apelativo intermedio tiene que cumplir con la exigencia de la Regla 36.4 de Procedimiento Civil y debe exponer concretamente cuáles hechos materiales encontró que están en controversia y cuáles están incontrovertidos. [...]*
>
> *[Por el contrario], de encontrar que los hechos materiales realmente están incontrovertidos, el foro apelativo intermedio procederá entonces a revisar de novo si el Tribunal de Primera Instancia aplicó correctamente el Derecho a la controversia.*[67]

Desde luego, el alcance de nuestra función apelativa al intervenir en estos casos no comprenderá la consideración de prueba que no fue presentada ante el foro de primera instancia ni la adjudicación de hechos materiales en controversia.[68]

**-B-**

A su vez, la Ley Núm. 80 de 30 de mayo de 1976, conocida como la *Ley sobre Despidos Injustificados*, fue creada con el propósito de proteger al empleado de actuaciones arbitrarias del patrono e imponer remedios económicos que desalentaran la práctica de despedir empleados sin justa causa para ello.[69] El referido estatuto define **"empleado"** como:

> *Toda persona que trabaja para un patrono, que reciba compensación por sus servicios.* ***No incluye a*** *contratistas independientes, empleados gubernamentales, empleados cubiertos por un convenio colectivo vigente,* ***ni empleados que laboran bajo un contrato de empleo temporero por término*** *o proyecto.*[70]

Asimismo, y en lo pertinente, define **"contrato de empleo por término"** como:

---

[66] *Íd.*
[67] *Íd.* a las págs.,118-119.
[68] *Íd. Énfasis nuestro.*
[69] SLG *Torres-Matundan v. Centro Patología*, 193 DPR 920, 929 (2015).
[70] 29 LPRA sec. 185n. *Énfasis nuestro.*

> *[U]n contrato de empleo escrito o verbal basado en una relación de empleo que se establece para un periodo de tiempo específico o proyecto particular.[71]*

Cónsono con lo anterior, el Artículo 1 de la referida ley establece que "[t]odo empleado que trabaja para un patrono mediante remuneración, **contratado sin tiempo determinado**, que fuere despedido **sin que haya mediado una justa causa**, tendrá derecho a recibir de su patrono por concepto de indemnización por despido [lo que se conoce comúnmente como la mesada]".[72]

De igual manera, la Ley Núm. 80 establece como justa causa para un despido *"aquella que no esté motivada por razones legalmente prohibidas y que no sea producto del mero capricho del patrono. Además, se entenderá por justa causa aquellas razones que afecten el buen y normal funcionamiento de un establecimiento[.]"*[73]

### -C-

Por otro lado, sabido es que, por disposición constitucional, se prohíbe el discrimen por razón de edad.[74] En consonancia con lo anterior, la Ley Núm. 100 de 30 de junio de 1959, conocida como la *Ley Antidiscrimen de Puerto Rico*, le impone tanto responsabilidad civil como penal a:

> *Todo patrono que despida, suspenda o discrimine contra un empleado suyo en relación a su sueldo, salario, jornal o compensación, términos, categorías, condiciones o privilegios de su trabajo, o que deje de emplear o rehúse emplear o reemplear a una persona, o limite o clasifique sus empleados en cualquier forma que tienda a privar a una persona de oportunidades de empleo o que afecten su status de empleado, **por razón de edad**[.][75]*

En el ámbito federal, el Tribunal Supremo de los Estados Unidos desarrolló en *McDonell Douglas Corp. v. Green*,[76] y en *Texas Department of Community Affairs v. Burdine*,[77] un estándar

---

[71] *Íd.*
[72] 29 LPRA sec. 185a. *Énfasis nuestro.*
[73] *Íd.,* sec. 185b.
[74] Art. II, Sec. 1, Const. ELA PR, LPRA, Tomo 1.
[75] Art. 1 de la Ley Núm. 100 de 30 de junio de 1959, 29 LPRA, sec. 146.
[76] 411 US 792 (1972).
[77] 450 US 248 (1980).

probatorio especial que ha sido equiparado a los casos presentados al palio de la Ley Núm.100.[78] En específico, le corresponde al empleado demandante establecer un caso *prima facie* de discrimen probando lo siguiente:

> *(1) [Que] pertenece a la clase protegida [por la legislación], esto es, cuenta con más de cuarenta años de edad; (2) está cualificado para ejercer las funciones del empleo; (3) a pesar de su capacidad, fue despedido; y (4) fue sustituido por una persona más joven.[79]*

Solo cuando el empleado establece estos elementos, se activa una especie de presunción de discrimen y le corresponde al patrono demandado ofrecer una explicación razonable de que el despido no fue discriminatorio.[80]

**-D-**

Por otra parte, en materia de derecho laboral, nuestro ordenamiento jurídico le brinda al obrero o empleado un mecanismo sumario para ventilar ciertas causas de acción. Este vehículo procesal se encuentra regulado por la Ley Núm. 2 de 17 de octubre de 1961, según enmendada, conocida como la *Ley de Procedimiento Sumario de Reclamaciones Laborales*, 32 LPRA sec. 3118, *et seq.*, y la mismo dispone en su Sec. 1 sobre la presentación de una querella laboral, lo siguiente:

> *Siempre que un obrero o empleado tuviere que reclamar de su patrono cualquier derecho o beneficio, o cualquier suma por concepto de compensación por trabajo o labor realizados para dicho patrono, o por compensación en caso de que dicho obrero o empleado hubiere sido despedido de su empleo sin causa justificada, podrá comparecer ante la Sala Superior del Tribunal de Primera Instancia, del lugar en que realizó el trabajo o en que resida el obrero o empleado en la fecha de la reclamación y **formular contra el patrono una querella en la cual se expresarán por el obrero o empleado los hechos en que se funda la reclamación**.[81]*

Es decir, le corresponde al obrero o empleado que presenta una querella laboral al amparo del procedimiento sumario, ***exponer***

---

[78] *Jiménez Soto v. Carolina Catering, Corp.*, 2025 TSPR 3 a la pág. 21.
[79] *Soto v. Hotel Caribe Hilton, supra,* a la pág. 305.
[80] *Íd.*
[81] 32 LPRA sec. 3118. *Énfasis nuestro.*

***los hechos fácticos suficientes en los cuales fundamenta su reclamo y petición de remedio.***

**-E-**

Por último, cabe destacar las disposiciones de la Ley Núm. 26-1992, conocida como la *Ley Para Reglamentar la Contratación de Empleados Temporeros a Través de Compañías de Servicios Temporeros.*[82] Esta ley dispone, en lo pertinente, que la contratación de empleados temporeros por compañías de servicios temporeros no podrá ser utilizada como subterfugio para evadir las disposiciones de la Ley Núm. 80.[83] Además, que en casos relativos a discrimen laboral así como despido injustificado, responderán al perjudicado solidariamente tanto la compañía cliente como la compañía de empleos temporeros.[84]

**-III-**

De umbral, por estar en la misma posición que el TPI ante las mociones de sentencia sumaria de la parte apelada y los escritos en oposición de la parte apelante, procedemos a examinar, de *novo*, si las partes cumplieron con la Regla 36.3 de Procedimiento Civil. Un análisis de los escritos de las partes apeladas nos lleva a concluir que cumplieron a cabalidad con las disposiciones de la referida regla. En específico, enumeraron los hechos esenciales propuestos como incontrovertidos y los sustentaron junto con documentos admisibles en evidencia.

Por su parte, en lo que respecta a sus escritos en oposición a las solicitudes, la parte apelante cumplió con las disposiciones de la Regla 36.3 (b) de Procedimiento Civil. Esto por cuanto identificó los hechos pertinentes incontrovertidos y propuso aquellos controvertidos. De igual forma, acompañó su escrito en oposición a

---

[82] 29 LPRA sec. 575, *et seq.*
[83] *Íd.,* sec. 575c.
[84] *Íd.,* sec. 575b.

la solicitud de Kelly Services con documentos admisibles en evidencia y, en cuanto a su escrito en oposición a la solicitud de Amgen, aunque no lo acompañó con documentos, hizo referencia a documentos que obran en el expediente.

Por todo lo anterior, entendemos que tanto la parte apelante como la apelada cumplieron con las disposiciones exigidas por la Regla 36 de Procedimiento Civil.

Ante esto, el TPI emitió la *Sentencia* por vía sumaria en la que adoptó treinta y nueve (39) y cuarenta y seis (46) determinaciones de hechos incontrovertidos, propuestos por Kelly Services y Amgen, respectivamente. Cónsono con lo anterior, y al estar en la misma posición que el foro *a quo*, adoptamos las determinaciones de hechos materiales incontrovertidos que obran en la referida sentencia, por entender que están sustentados en la prueba que se acompañó junto con las solicitudes.

A la luz de la normativa expuesta, procedemos a evaluar los errores señalados en el recurso ante nuestra consideración. No obstante, por ser similares entre sí, los mismos serán discutidos conjuntamente. En síntesis, la parte apelante señala que el TPI incidió al resolver el presente caso por vía sumaria, a pesar de la existencia de hechos materiales en controversia que establecían que nunca violentó el protocolo de seguridad por COVID-19 y que, por lo tanto, su despido fue injustificado. Además, asevera que su despido respondió a discrimen por razón de edad. **No tiene razón.**

Primeramente, la parte apelada instó sendas mociones de sentencia sumaria en las que formularon una extensa lista de hechos materiales, sosteniendo que no estaban en controversia. En apoyo, se acompañaron las solicitudes con la deposición tomada a la señora Pedraza Abreu, declaraciones juradas y otros documentos, de los cuales hicieron una detallada y específica referencia.

En segundo orden, la señora Pedraza Abreu sometió sus escritos en oposición con prueba con la que no pudo rebatir los hechos formulados por la parte apelada. Además, aseveró la improcedencia de la disposición sumaria del pleito amparándose en inferencias y en sus propias interpretaciones de los hechos. Consecuentemente, la parte apelante no logró impugnar los hechos propuestos por la parte apelada, por lo que el TPI concluyó que, conforme a la prueba presentada, no era de aplicación la Ley Núm. 80, ni la terminación de la asignación de empleo se debió a un discrimen por razón de edad o causa justificada.

Todavía más, nótese que los escritos de la señora Pedraza Abreu en oposición a las mociones de sentencia sumaria no tuvieron el efecto de controvertir los hechos materiales y esenciales propuestos por la parte apelada; inclusive, estos fueron admitidos por la parte apelante en su deposición y se encontraban debidamente sustentados por prueba admisible en evidencia. Específicamente, la señora Pedraza admitió: **(1)** que su empleo era uno temporero; [85] **(2)** que tuvo conocimiento de que Amgen estableció un protocolo de seguridad de COVID-19 que disponía, entre otras cosas, que quien tuviera contacto con alguien expuesto a un contagio de COVID-19, debía reportarlo inmediatamente a sus supervisores;[86] **(3)** que el 23 de abril de 2020, ella y sus hijos se realizaron pruebas de detección de COVID-19;[87] **(4)** que no notificó

---

[85] Apéndice 5 del Recurso de Apelación, pág. 118 (deposición de la señora Pedraza Abreu, pág. 50, líneas 13-16):
*P. O sea, ¿que cuando usted solicita empleo en Kelly[,] usted sabe que se trata de un empleo temporero? ¿Correcto?*
*R. Correcto.*

[86] *Íd.,* pág. 144 (deposición de la señora Pedraza Abreu, pág. 76, líneas 10-15):
*P. O si la persona, el empleado de Kelly o de Amgen – si fuera un empleado de Kelly destacado allí, hubiese tenido algún contacto o exposición con alguien contagiado con COVID, debía reportarlo inmediatamente, ¿verdad que sí?*
*R. Es correcto.*

[87] *Íd.,* pág. 156 (deposición de la señora Pedraza Abreu, pág. 88, líneas 19-25):
*P. Okey. Usted se hizo la prueba de COVID, ¿verdad que sí[?] [¿][P]ara abril de 2020?*
*R. Correcto.*

inmediatamente lo anterior a sus supervisores;[88] **(5)** que en Amgen permanecieron trabajando personas mayores que ella en edad;[89] y **(6)** que, más allá de aducir que permanecieron trabajando en Amgen personas menores en edad, no posee ningún otro hecho para sustentar el discrimen por razón de edad.[90]

Por consiguiente, a la luz de las propias admisiones de la parte apelante, vertidas bajo juramento en una deposición, no puede entenderse el presente caso como uno en el que la credibilidad, intencionalidad u otros elementos subjetivos, son factores

---

*P. Y[,] a través de su abogado[,] usted presentó copia de la misma – tiene fecha del 23 de abril.*
*R. Correcto.*

[88] *Íd.,* págs. 158-159 (deposición de la señora Pedraza Abreu, pág. 90, línea 25 y pág. 91, líneas 1-24):
*P. Okey. Le pregunto, antes de hacerse la prueba de COVID-19, ¿usted reportó a Amgen que se la iba a hacer? ¿O a Kelly?*
*R. No.*
*P. Luego de hacerse la prueba de COVID-19 y recibir ese resultado negativo, ¿usted reportó ese resultado a Kelly o a Amgen?*
*R. Lo reporté a –*
*P. ¿Usted fue – escuche la pregunta? La voy a reformular. Tan pronto usted salió del laboratorio, ¿usted llamó a su supervisor en Amgen y reportó que se había hecho la prueba y que había arrojado un resultado negativo? ¿Verdad que no?*
*R. No tenía que hacer eso.*
*P. Okey. Pero no lo hizo, ¿verdad que no?*
*R. No.*
*P. No. ¿Tampoco hizo eso con Kelly? Tan pronto salió del laboratorio, que le entregaron los resultados, no llamó a Kelly y le notificó que había arrojado un resultado negativo en la prueba, ¿verdad que no?*
*R. Negativo.*
*P. No lo hizo, ¿verdad que no?*
*R. No.*

[89] *Íd.,* pág. 46 (deposición de la señora Pedraza Abreu, pág. 132, líneas 2-5):
*P. [I]nclusive, permanecieron trabajando en Amgen luego de que terminara su asignación, empleados mayores que usted. ¿Verdad que sí?*
*R. Entiendo que sí.*

[90] *Íd.,* págs. 198-199 (deposición de la señora Pedraza Abreu, pág. 130, líneas 15-25 y pág. 131, líneas 1-11):
*P. Okey. Déjeme ver si la entiendo. ¿Los hechos específicos en los cuales usted basa su reclamación de alegado despido injustificado es que terminó la asignación, y se quedaron trabajando otros empleos [sic]?*
*R. Yo entiendo que mi asignación todavía no había terminado ahí, y dejaron empleados trabajando de menor edad que yo.*
*P. Okey. Aparte de que la asignación suya – o sea, la fecha de la terminación de la asignación de acuerdo a su contrato no había llegado, y, que según usted, que se quedaron trabajando empleados menores que usted en Amgen, ¿algún otro hecho en específico en el cual usted base su reclamación de alegado despido injustificado?*
*R. Que fue un despido injustificado.*
*P. ¿Algo más? Escuche la pregunta. ¿Algún otro hecho?*
*R. No.*
*P. ¿Perdón?*
*R. No.*

concluyentes y determinantes para la adjudicación del caso. Siendo así, la disposición del pleito por la vía sumaria es apropiada.

En otras palabras, la realidad fáctica y las propias admisiones de la parte apelante reconociendo que su empleo era de carácter temporero, impiden la aplicabilidad de las disposiciones de la Ley Núm. 80. De igual manera, las aseveraciones de la parte apelante no satisfacen la carga probatoria para sostener un caso de discrimen laboral por razón de edad, a la luz de la normativa jurisprudencial.

Por lo tanto, actuó correctamente el TPI al determinar que se probó la inexistencia de controversias de carácter sustancial en los hechos esenciales y resolver el pleito por la vía sumaria en favor de la parte apelada.

**-IV-**

Por los fundamentos antes expuestos, **confirmamos** la Sentencia apelada.

Lo acordó el Tribunal y certifica la secretaria del Tribunal de Apelaciones.


Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones